IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

| | | |
|---|---|---|
| SELENIA WILBORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 3:08cv928-MHT |
| | ) | (WO) |
| SOUTHERN UNION STATE | ) | |
| COMMUNITY COLLEGE; et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

Plaintiff Selenia Wilborn filed this lawsuit against

defendants Southern Union State Community College, Alabama

Department of Economic and Community Affairs (ADECA), and

Alabama Department of Postsecondary Education (ADPE),

charging sexual harassment, sex discrimination and

retaliation in violation of Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e to

2000e-17, and Title IX of the Education Amendments of 1972,

as amended, 20 U.S.C. § 1681(a).  Wilborn also names John

Lee and Doug Conaway as defendants in their individual

capacities, alleging violations of the 14th Amendment to

the United States Constitution, as enforced by 42 U.S.C. § 1983.  She further alleges that various groups of these defendants are liable for state-law torts committed against her.  Jurisdiction over Wilborn's federal claims is proper under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights) and 42 U.S.C. § 2000e-5(f)(3) (Title VII). Jurisdiction over her state-law claims is appropriately invoked pursuant to 28 U.S.C. § 1367 (supplemental).

This lawsuit is before the court on the defendants' motion for summary judgment.  For the reasons that follow, that motion will be granted in part and denied in part.

## I.   SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).   In deciding whether summary judgment should be granted, the court must view the evidence in the light most favorable to

2

the non-moving party and draw all reasonable inferences in favor of that party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. BACKGROUND

### A.  The Defendants

This lawsuit arises out of Wilborn's experience as the lone female participant in the summer 2007 session of the Central Alabama Skills Training Consortium (CASTC) Tractor-Trailer Truck Driver Program (Truck Program), a vocational program physically located in Selma, Alabama.

Wilborn names two individual defendants: Truck Program instructors Lee and Conaway.  Lee, the "lead instructor," supervised Conaway. The program involved a combination of classroom instruction and driver training with tractor-trailers.  The instructors, each an experienced truck driver, shared responsibility for teaching classroom and driving sessions.  They also cooperatively and separately administered a series of written and driving tests that participants were required to pass to complete the program.

Lee graded all written examinations, but each instructor scored the driving tests he administered. Neither man is currently employed by the Truck Program, which has been discontinued, or  by any other defendant in this lawsuit.

Wilborn also names three institutional defendants: Southern Union, ADECA, and ADPE. Wilborn initially named CASTC as a defendant in this lawsuit, but the parties have subsequently stipulated that CASTC "is a subdivision of Southern Union Community College." J. Stip. and Mot. to Dismiss at 1 (Doc. No. 35). It is thus undisputed that the CASTC Truck Program is operated by Southern Union and that Lee and Conaway are Southern Union employees. It is also undisputed, however, that the Truck Program was not administered on a Southern Union campus.

Unfortunately, the parties have provided only a sketchy, and often confusing, account of ADPE and ADECA's respective relationships with the Truck Program, Lee, and Conaway. Indeed, deposition testimony suggests that even program administrators were confused about these relationships. The evidence before the court, however,

4

supports at least the following conclusions:

CASTC, and two other regional consortiums, were initially approved and created by ADPE to "provide ... a variety of employment and training services to certain populations" in Alabama.  Pl.'s Ex. F at 19:19-20 (Doc. No. 43-9).  The consortiums provided these services through so-called "Careerlink Centers."  One level of service provided by the centers is directed at helping eligible participants acquire "a new marketable skill in order to become employed." Id. at 23:6-7.  The CASTC Truck Program was this type of service.

Participants in consortium programs, including the Truck Program, were not required to pay for their training. Rather, they received federal grants under the Work Force Investment Act (WIA) through ADECA, a self-described "partner" in the Careerlink Centers.  See Pl.'s Ex. G at Dep. Ex. 24 (Doc. No. 43-10).  The day-to-day operations of the Truck Program were also completely funded by WIA funds, provided through ADECA to Southern Union.  Thus, for example, Lee, Conaway and other program employees received

paychecks from Southern Union, but the money was
distributed to the college by ADECA.

ADECA also provided guidelines for the operation of the
Careerlink Centers and the training programs.  Bud Edwards,
the Training Coordinator for CASTC, stated that "as a
consortia, you're under [ADECA] guidelines all the time."
Pl.'s Ex. B at 20:21-22 (Doc. No. 43-4).[1]  ADECA provided
all program application and enrollment forms; dictated the
rules and regulations for participant eligibility; and set
minimum requirements for program enrollment and post-
program employment.  Apparently, even the substance of the
Truck Program curriculum was, in part, dictated by ADECA
guidelines.[2]

_____

    1.  As Training Coordinator, Edwards was responsible
for "supervis[ing] the instructors ... [and] the
operations of the class, as far as the purchasing of
equipment, purchasing of supplies, maintenance of
equipment[,] ... budgeting ... [and] ensuring that the
classes were run properly."  Pl.'s Ex. B at 23:10-16.

    2.  When asked whether Lee and Conaway could "just
wing off and decide they were going to teach their course
in a way that contradicted what ADECA had set out,"
                                        (continued...)

### B. The Truck Program

Wilborn, seeking new employment opportunities, applied
for participation in the Truck Program through the Selma
Careerlink Center.  When she expressed an interest in truck
driving, she was referred to Ron Brown, the program's case
manager.  Brown's job was to recruit participants for the
program, determine their eligibility under ADECA
guidelines, complete ADECA paperwork, and enroll them in
the program.  Brown explained that his job was also to
"maintain those participants in the program until they
complete the program."  Pl.'s Ex. G at 12:8-9.  To this
end, Brown monitored each participant's progress and helped
them to resolve any difficulties they might face.

Although Brown determined whether Wilborn and other
applicants were eligible for the program, he did not have
the power to select the students who were ultimately

_____

(...continued)
Edwards responded, "No."   Pl.'s Ex. B at 83:15-20.
Edwards also agreed that it was part of his job to
"mak[e] sure that [the instructors] kept in with [ADECA]
guidelines."  Id. at 83:22-84:1.

7

enrolled.    Rather,   he   created   a   list   of   eligible applicants, who were then interviewed by Lee.  Following these  interviews,  Lee  selected  six  to  eight  people  to participate in the program.

According  to  orientation  materials  distributed  to Wilborn and other program participants, "The CASTC Tractor-Trailer  Truck  Program  is  a  six  week,  highly  intensive occupational  training  program  with  the  end  result  being employment in the field."  Pl.'s Ex. B at Dep. Ex. 1.  Lee testified  that  this  description  was  apt,  "It  was  a  job orientated school."  Pl.'s Ex. C at 49:23-50:1 (Doc. No. 43-6).  In fact, Lee was required to place 70 percent of program participants into a job.

In order to achieve this goal, the program did much more than simply train participants to drive trucks.  For example,   program   participants   were   provided   with application materials for various trucking companies.  They were also required, over the course of the program, to file five employment applications with five different companies. Lee   and   Conaway   assisted   participants   with   their

8

applications and helped them to fax the completed materials
to potential employers.   In fact, a fax machine was
dedicated to this purpose.   In some cases, the instructors
would also call local employers to inquire about available
positions.

The instructors regularly invited six to twelve
trucking company employment recruiters to visit the
program.   Recruiting visits were scheduled over the
duration of the program, with some companies visiting as
early as the first week.  According to Conaway, the purpose
of these visits was "[t]o help the students get
employment."  Pl.'s Ex. D at 17:15-16 (Doc. No. 43-7).  But
the visits also helped trucking companies procure
employees.  As Lee explained it, "when a recruiter comes
in, he ... tells them all the benefits the company has
[and] why they should come to work for this company as
opposed to another company."   Pl.'s Ex. C at 45:6-10.
Indeed, program orientation materials informed participants
that "there will be several truck driver company recruiters
coming to the class to 'sell' you on their respective

9

companies.  List[en] to each and make a decision based upon your particular need and goal in finding employment." Pl.'s Ex. B at Dep. Ex. 1.

Lee testified that participants "were mostly required to fill out an application [prior to a recruiter's visit]. Some of the recruiters would stand there and wait for them to fill out their applications while they were there." Pl's Ex. C. at 47:5-9.  Some of the recruiters would also conduct interviews and conditionally hire participants, pending successful completion of the course.

Lee selected program participants with employment in mind: "If they came in with a bad [Motor Vehicle Record], no work history or [a] criminal record, they were not going to get selected into a job.  So I was not doing my job if I actually let them in the class."  Pl.'s Ex. C at 37:13-17.  And Lee considered the hiring desires of the trucking companies themselves; he selected Wilborn for the program, in part, because she was a woman.  He explained, "Trucking companies were trying to get us to ... train female drivers."  Id. at 67:21-23.

The program continued to help participants procure
employment even after they completed their training.  Brown
explained, "Once they complete the program, they either go
to a job or they don't have a job, then it's my job ... to
be out there looking for a job for them ... in the trucking
industry."  Pl.'s Ex. G at 152:14-19.

### C.  Truck Program Grievance Procedures

On the first day of the program, Wilborn and the other
participants attended an orientation session conducted by
Edwards, who supervised Lee and Conaway.  He provided each
participant with a packet containing, among other things,
the Truck Program's "Grievance Procedures."  It states, in
pertinent part,

> "Discuss any problem that arises as soon
> as possible, do not let it 'grow' into a
> major problem.  If there is a problem in
> class, talk to your immediate instructor
> first.  If there is no satisfaction after
> this process, discuss it with the lead
> instructor.  If there is still no
> satisfaction, discuss the situation with
> your Case Manager.  If there is still no
> satisfaction, the Training Coordinator
> will be called in to resolve the
> situation.  ...  These policies and

11

> procedures must be complied with in every
> case and it is imperative to work within
> the system."

Pl.'s Ex. B at Dep. Ex. 1.  Although not spelled out in the

written policy, Edwards explained to participants that if

they felt uncomfortable reporting a problem to either

instructor, they could report it directly to him or

Brown.[3]  If Brown received a serious complaint, including

complaints about sexual harassment, he was obligated to

inform Edwards.

At some other time, Brown presented a second written

grievance policy to program participants, this one from

ADECA.  This document states, in relevant part,

> "If you think someone discriminated
> against you because of your race, color,
> religion, sex, national origin, age,
> disability, political relationships or
> beliefs[,] ... you may file a complaint
> within 180 days of the date you think the
> discrimination happed with either Ms.
> Lillian Patterson, Equal Opportunity
> Grievance Officer at [ADECA], Workforce

_____

3.  Brown's office was at the Selma Careerlink
Center, near the Truck Program facilities.  Edward's
office was in Opelika, Alabama, over 100 miles from
Selma.

12

> Development Division, 401 Adams Avenue,
> PO Box 5690, Montgomery, Alabama 36103-
> 5690] <u>or</u> the Director, Civil Rights
> Center (CRC), U.S. Department of Labor,
> 200 constitution Avenue NW, Room N-4123,
> Washington, D.C. 20210."

Pl.'s Ex. G at Dep. Ex. 24.  Brown went over the document quickly, "hitting points here and there."  Pl.'s Ex. A at 253:19 (Doc. No. 43-2).  After participants signed the document, acknowledging that the procedure had been explained to them, he collected it from them and did not return it.

In spite of the two written grievance procedures, Lee told participants on the first day of the program, "whatever goes on [in] this motherfucking class stays in this class."  Pl.'s Ex. A at 87:13-14.

### D. Sexual Harassment Training

As noted above, the Truck Program's written grievance procedure directs participants to bring any problems to Conaway, Lee or Brown.  According to Edwards, this included complaints about sexual harassment in the program.  <u>See</u> Pl.'s Ex. B at 59:19-60:10.  However, the document itself

13

does not mention sexual harassment or any kind of discrimination.[4]

As instructors in the program, Lee and Conaway received informal training on sexual harassment policy from Edwards. As Lee explained it,

> "[W]e had an ongoing thing.  Mr. Edwards, he would reiterate constantly.  He was so conscientious about sexual harassment, that we would talk.  It wasn't a prescribed class, per se.  But it was an ongoing conversational-type training as time went on.  We never had a meeting that we didn't discuss some kind of harassment, whether it be sexual [or] racial."

Pl.'s Ex. C at 15:15-23.  When asked what he "learned from all this discussion with Mr. Edwards about sexual harassment," Lee replied, "Touching, dirty language, sexual innuendoes about jokes or something of that nature [were all prohibited].  Definitely no touching.  Even when we

---

4. Nor does the ADECA policy use the word "harassment," although it does note a prohibition against discrimination in "[p]roviding opportunities or treatment in a WIA program or activity."  Pl.'s Ex. G at Dep. Ex. 24.

were in the truck, I could not hold her hand to teach her
how to shift the gears.  That's how adamant [Edwards] was
about touching and sexual harassment."  Id. at 19:22-20:7.
Lee also acknowledged receiving a written policy on sexual
harassment from Southern Union and ADPE.

Edwards confirmed that he held informal trainings on
sexual harassment with Lee and Conaway.  He stated, "I'll
take all of my instructors, pull them in and we'll sit down
and discuss the policy, and I give them a copy of it."
Pl.'s Ex. B at 80:16-19.  He specifically stated that he
provided a written sexual harassment policy to Lee and
Conaway.

In contrast, and although Edwards expected program
participants to bring complaints to their case manager,
Brown lacked even informal training on sexual harassment.
Indeed, he testified that, in his thirteen years as a case
manager, he received no training on sexual harassment.
When asked if he trained program participants on sexual
harassment, Brown replied, "No.  They would get the
grievance form that would encompass any complaint that you

15

might have."  Pl.'s Ex. G at 27:22-27:1.

    E.  Wilborn's Experience in the Truck Program

As discussed above, Wilborn applied for admission to the Truck Program through the Selma Careerlink Center. After Brown determined that she was eligible for the program, Wilborn was interviewed by Lee.  During this initial interview, Lee stated, "Young lady, you look like you should be at home making babies instead of trying to drive a truck."  Pl.'s Ex. A at 57:19-21.  This remark bothered Wilborn and so, after the interview, she went to discuss it with Brown.  She asked Brown, "is this man prejudiced against women or is he just prejudiced or what?" Id. at 60:8-10.  Rather than offering to address the problem, Brown responded with a question of his own: "[W]ell, Selenia, are you tough enough to handle it?"  Id. at 60:13-14.

Lee did not initially select Wilborn for the program. However, two people he had selected withdrew before the program began.  Lee testified that Brown called to notify

16

him of these withdrawals and asked Lee to select Wilborn.
Lee agreed, in part because trucking companies had been
encouraging him to train female drivers.

On the first day of the program, while introducing
himself and Conaway to the participants, Lee told a joke
that ended with the punchline, "there is nothing wrong with
a little pussy." Id. at 89:4-5. According to Wilborn,
"all the guys start[ed] laughing and looking right [at]
me." Id. at 89:7-8. She was alone in a room full of men;
the only female among the eight people Lee selected for the
2007 summer session of the program.

Wilborn reported the joke to Brown after class. The
next day, Lee told the participants for the second time
that if they have a problem in class, they needed to keep
it in the class. According to Wilborn, "He said that when
he was standing in front of the whole class, but he looked
directly at me." Id. at 174:3-5.

Lee's behavior on the first day set a trend that would
continue for the duration of the program. Wilborn
testified that, throughout the program, Lee "was constantly

17

telling nasty jokes; constantly." Id. at 170:19-20. Asked
to describe the jokes, she explained that, "They were
pertaining to women, parts of their body ... [and] to men
and women having sex." Id. at 172:6-9. Wilborn frequently
expressed her disgust with the jokes by standing up and
walking away.  She also continued to make complaints to
Brown.

   Lee also touched Wilborn.  On at least two occasions
he "popped" her across the buttocks.  One of those times,
he told her that she was "sweet smelling" while striking
her.  Both times she told him to stop.  These incidents
prompted at least one of Wilborn's classmates to refer to
Lee as a "dirty ole man."  Wilborn reported these events to
Brown.

   At one point during the program Wilborn was bitten by
a spider in one of the trucks.  When she told Lee about the
bite, which was on her back, he pulled her shirt up from
behind.  Wilborn had to hold her arms across her chest to
prevent exposure of her breasts. Despite her protests, Lee
continued to hold up her shirt and called Conaway over to

18

examine her back.  He said, "come here, Doug, let me show this spider bite on Selenia; it must be a man spider because it didn't bite nobody but her."  Id. at 141:7-10. When Wilborn tried to pull down her shirt and walk away, Lee pulled out the elastic part of her pants, exposing her underwear.  Again, she told him to stop.  Again, she reported the incident to Brown.

Early in the program, Wilborn and Conaway were sitting outside when he noticed a pair of plastic handcuffs hanging from the rearview mirror of her car.  He made an innappropriate comment about them.  On another occasion, when the students were practicing hitching a truck to a trailer, Conaway provided verbal instructions to each of the male students.  However, when it was Wilborn's turn, he refused to provide assistance.  When she asked for help he replied, "your good looks ain't going to help you all the time[.] ... [W]hat are you going to do when there's no guys around ... to help you[?]"  Pl.'s Ex. A at 155:23-156:6. Wilborn reported the comment to Brown.

19

Another time, a male participant brought a pornographic film to class.  Conaway set up the classroom projector to display the film and then stood near the door, stating that he needed to keep watch so that they would not get caught by another program employee.  Wilborn tried not to watch the movie, keeping her eyes on a piece of paper on her desk.  However, Conaway drew her attention to the film, stating: "I bet you never had one that big, Selenia."  Id. at 180:1-2.  When she looked up, she saw a woman having sex with a horse.  Wilborn walked out of the classroom.  She later told Brown about the movie.

Although Lee yelled and cursed in front of the class from time to time, he was especially harsh with Wilborn.  She testified to this differential in treatment:

> "Q: And did he fuss at everyone like you say he fussed at you?
>
> "A: No ma'am.
>
> "Q: You never heard him say anything that you thought was, you know, gruff or angry towards any other student?"
>
> "A: No ma'am.  He was always, always trying to help the men out; always."

20

Id. at 234:13-20.

One example of this gruff treatment occurred during
Wilborn's final test.  At the time, she had completed all
other requirements for the course, and needed only to pass
a road-driving test administered by Lee.  She described the
episode as follows:

> "[W]e were going down the road [and]
> there was a little bitty car in front of
> the truck.  If you're going to up your
> speed, once you get to six[th gear,] you
> have to push the splitter up.  If you are
> going to like try to stop the truck, you
> have to push the splitter down. ... I see
> that I have to reduce my speed.  I start
> down shifting.  And before I got to the
> splitter, [Lee] snatches the gearshift
> out of my hand [and yelled] 'dumb ass.'
> I mean, I was just stunned.  I sat there
> -- my hand was on the splitter, his hand
> was on the splitter.  Once you stop a
> truck like that, there [is] so much in
> the back of that truck, it's going to
> make [a] big clashy-like noise like a
> boom, boom, boom, because everything is
> coming from your back into the front."

Id. at 121:13-122:6.  She was very nervous about hitting
the car in front of them: "To my remembrance, I was right
up on the car.  I actually thought I was going to hit that

21

person in that car." <u>Id</u>. at 121:11-13.  On the way back
to the program facilities, Lee stated, "see, I told you
some women are supposed to be at home making babies instead
of trying to drive a truck."  <u>Id</u>. at 206:13-16.

Although she could have retaken the road test--Lee had
failed her for "stalling the engine"--Wilborn elected to
quit the program.[5]  She explained, "I saw clearly, because
everything they did to me, they were trying to prevent me
[from] getting my license, so I left."  <u>Id</u>. 132:19-21.
When she got home, Conaway called her and asked her to come
back, but "[a]t that point in time, [she] ... was in
tears."  <u>Id</u>. 133:3-4.  In fact, she was on the verge of a
panic attack and opted to go to the emergency room.

Nor was this the first time that she had visited her
doctor as a result of the "abuse [she] was going through."
<u>Id</u>. at 239:21.  She had previously had panic attacks
related to the Truck Program and, approximately two weeks

_____

    5.  "[S]he still had two full days to test when she
walked out of the class."  Pl.'s Ex. C at 144:9-11.

into the program, her doctor placed her on medication.  She later explained that her anxiety influenced her decision to quit the program: "How could I not walk out?  I had taken all that I could take.  I had started having anxiety attacks, I had started getting nervous."  Id. at 199:1-4.

The day after she walked out, Wilborn went to Careerlink to make a complaint to Brown.  On her way, she stopped at the program and spoke with Conaway, who offered to re-test her.  Again, she declined.

When she arrived at Careerlink, she was in tears.  She briefly spoke with one of Brown's superiors, Cliff Hunter, who told her that Brown was not at the office.  She described their interaction:

> "He kept asking me what was wrong or could he do anything.  I didn't tell him what was wrong because I hadn't been talking to him, and at that point in time, I was so emotional there was no sense in me trying to sit there and explain everything that I had [already] told Mr. Brown.  I wanted to speak to Mr. Brown."

Id. at 202:14-21.

23

Later that evening, she was able to meet with Brown to again make complaints about the program. For the first time, he asked her to make a written complaint.

Although Brown did not contact Edwards, Hunter did. Edwards later met with Wilborn to interview her about her complaints. At that time, he offered to allow her to re-take the final road test with different instructors. She declined again, later explaining, "they knew what these instructors [were] doing ... to me, why would I want to go to another part of their school?" Id. 224:10-11.

Wilborn timely filed claims of sexual harassment, discrimination and retaliation with the Equal Employment Opportunity Commission and subsequently received authorization to file a private lawsuit. She filed her complaint with this court, and defendants responded with a motion for summary judgment on all claims. That motion is now before the court.

24

### III.  DISCUSSION

### A.  Federal Claims

### 1.  Title VII

Wilborn brings claims to redress sexual harassment, sex discrimination, and retaliation in violation of Title VII against Southern Union, ADECA and ADPE.  Defendants claim that Title VII provides her no cause of action, as they were neither her employer nor acted as an employment agency with respect to her.  Defendants argue that, even if the statute applies under the latter theory, a Title VII sexual harassment claim requires the existence of an employment relationship between a plaintiff and defendant, and thus cannot be asserted against an employment agency.  In any event, defendants contend that Title VII does not extend liability for the alleged discriminatory acts to either ADECA or ADPE, because neither employed the alleged perpetrators of the acts.  Finally, defendants assert that each of Wilborn's Title VII claims fail on the merits.

The court first addresses the group of arguments regarding the applicability of Title VII to the named

25

parties and alleged facts, and then turns to the merits of Wilborn's claims.

### a.  Applicability of Title VII

Title VII applies to employment agencies as well as employers.  42 U.S.C. § 2000e-2(a)-(b).  The statute defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  § 2000e(b).  "The term 'employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person."  § 2000e(c).[6]  "Unlike the definition

_____

6.  There is no dispute that each defendant is a person as that term is used in Title VII.  42 U.S.C. § 2000e(a) ("The term 'person' includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated (continued...)

for 'employer[,]' ... the definition for 'employment agency' does not require a minimum number of either employees or weeks of employment for the agency." <u>Jones v. Southeast Ala. Baseball Umpires Ass'n</u>, 864 F. Supp. 1135, 1138 (M.D. Ala. 1994) (Thompson, J.). "Nevertheless, the definition does require that, in order to be an 'employment agency,' the entity must regularly do business with an 'employer,' and the term 'employer' as used in the definition of 'employment agency' is limited to those employers that fall within the definition of 'employer.'" <u>Id</u>.

Wilborn "has not alleged [that] the defendants acted as her 'employer' in the traditional sense, but rather that in relation to her they acted as an 'employment agency' under Title VII." Pl.'s Br. at 31 (Doc. No. 42). Thus, in ascertaining whether Wilborn may properly bring Title VII claims against the defendants, the court must first

---

(...continued)
organizations, trustees, trustees under title 11, United States Code, or receivers.").

determine whether the Truck Program allegedly operated by the defendants is an "employment agency." As suggested by the definitions provided above, this "task is two-fold: first, to determine whether the [program] 'regularly undertakes with or without compensation to procure employees ... or to procure for employees opportunities to work'; and, second, to determine whether the [program] does this for an 'employer' as that term [is] defined in [Title VII]." <u>Jones</u>, 864 F. Supp. at 1138.

In addressing the first part of this two-fold task, the court finds little guidance from other courts. Almost thirty-five years ago, the Seventh Circuit Court of Appeals observed that, "Litigation concerning the meaning of the term employment agency is rather sparse." <u>Cannon v. University of Chicago</u>, 559 F.2d 1063, 1075-76 (7th Cir. 1976). And the term has rarely been the subject of meaningful dispute in the intervening years. See <u>Scaglione v. Chappaqua Cent. Sch. Dist.</u>, 209 F. Supp. 2d 311, 316 (S.D.N.Y. 2002) (McMahon, J.) ("There are very few cases

invoking 42 U.S.C. § 2000e-2(b)... and the few that do almost invariably involve an entity that is indisputably an 'employment agency.'").

Perhaps the most frequently cited case on the scope of the term "employment agency" is <u>Brush v. San Francisco Newspaper Printing Co.</u>, 315 F. Supp. 577 (N.D. Cal. 1970) (Sweigert, J.).  In that case, the court found that, "the statutory requirement that an employment agency be one that 'regularly' undertakes to procure employees or employment opportunities indicates that the Congress had in mind to include only those engaged to a significant degree in that kind of activity <u>as their profession or business</u>."  <u>Id</u>. at 580 (emphasis in original).  This court, like others before it, concurs with this reading of the statute.  <u>See, e.g.</u>, <u>Scaglione</u>, 209 F. Supp. 2d at 316 ("Several cases have approved of Brush's reasoning."); <u>Bonomo v. National Duckpin Bowling Congress, Inc.</u>, 469 F. Supp. 467, 472 (D. Md. 1979) (Blair, J.).  Thus, the court agrees that "an entity would not be an 'employment agency' within the

meaning of Title VII if it never, rarely, or even occasionally sought to secure employees for an employer." Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law 1598 (4th ed. 2007).

A reasonable jury would have little difficulty concluding that the Truck Program "engaged to a significant degree" in procuring employment opportunities for program participants as part of its business. Indeed, the program billed itself as a "highly intensive occupational training program with the end result being employment in the field." Pl.'s Ex. B at Dep. Ex. 1. And the program sought to achieve this "end result" for program participants, not simply through the quality of its training or by cultivating a reputation for such, but by actively assisting participants in the job search process.

Defendants make much of the fact that "Wilborn herself estimated that only about twenty percent of her time in the program was devoted to filling out job applications," def.'s br. at 13 (doc. no. 30), arguing that even reading

the evidence in Wilborn's favor, "no Defendant is engaged to any significant degree in job placement <u>as a profession</u>," <u>id</u>. at 12 (emphasis in original).  But the undisputed facts support a contrary conclusion.  Lee testified that he was "required to place 70 percent of [his] students into a job."  Pl.'s Ex. C at 37:12-13.  To reach this target, Lee and Conaway required each program participant to file applications with five different companies; helped participants fax job applications; invited recruiters from trucking companies to visit the program; and, facilitated job interviews on-site.[7]  Not only did the program provide participants unique access to employment opportunities, it required them to actively pursue these opportunities.  Indeed, the pursuit of employment in the trucking industry was a central and recurring component of the program.

_____

     7.  It is also noteworthy that Brown continued to help participants procure employment even after they had completed the program.

Presented with the evidence above, a reasonable jury could conclude that the Truck Program "regularly under[took] ... to procure for employees opportunities to work" for trucking companies. And because there is no dispute that the trucking companies at issue in this case are "employers" under Title VII, the court sees no reason to conclude otherwise. Summary judgment will be thus be denied on this issue.

Perhaps anticipating this ruling, defendants argue that, "Even if a Defendant is an employment agency, that Defendant cannot be liable for sexual harassment absent evidence of an actual employment relationship with the plaintiff." Def.'s Br. at 13. Defendants therefore maintain that summary judgment is due with respect to Wilborn's Title VII sexual harassment claims. Defendants do not fully articulate this argument, but their citations to caselaw suggest that the court may reach the desired conclusion through a comparative analysis of the language

32

of § 2000e-2(a) (unlawful employer practices) and § 2000e-2(b) (unlawful employment agency practices).

Section 2000e-2(a)(1) states that, "It shall be an unlawful employment practice for an <u>employer</u> ... to fail or refuse to hire or to discharge any individual, <u>or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment</u>, because of such individual's ... sex." (Emphasis added.)  Under § 2000e-2(b), it is "an unlawful employment practice for an <u>employment agency</u> to fail or refuse to refer for employment, <u>or otherwise discriminate against</u>, any individual because of his ... sex, or to classify or refer for employment any individual on the basis of his ... sex." (Emphasis added.)  Comparing these statutes, at least one court has observed that § 2000e-2(b), "which catalogs the list of unlawful employment agency practices, does not bar discrimination with respect to the 'terms, conditions, or privileges of employment.'"  <u>Riesgo v. Heidelberg Harris, Inc.</u>, 36 F.

33

Supp. 2d 53, 58 n.2 (D.N.H. 1997) (Diclerico, J.).   The

court concluded that, "Because it is this prohibition that

provides the basis for a hostile work environment claim

under Title VII, [such] claims are not cognizable under

§ 2000e-2(b)."   Riesgo, 36 F. Supp. 2d. at 58 n.2

(internally citing Harris v. Forklift Sys., Inc., 510 U.S.

17, 21 (1993)).[8]

     The Riesgo court found support in the reasoning of

Kellam v. Snelling Personnel Servs., 866 F. Supp. 812 (D.

Del. 1994) (Latchum, J.).   In that case, the court directly

addressed an argument that the phrase 'or otherwise

discriminate' indicates that § 2000e-2(b) "covers more than

just referral activities, and extends  ... to all those

_____

     8.  In Harris, 510 U.S. at 21, the United States
Supreme Court explained that, "The phrase 'terms,
conditions, or privileges of employment' evinces a
congressional intent 'to strike at the entire spectrum of
disparate treatment of men and women' in employment,
which includes requiring people to work in a
discriminatorily hostile or abusive environment."
(Citation and quotation marks omitted.)

activities employers are prohibited from engaging in." Id.

at 817.  The court rejected this argument, stating that:

> "If Congress had intended the language
> 'or otherwise to discriminate' to be all
> inclusive in its prohibitions then there
> would have been no need to include the
> supplemental phrase following this
> language, namely, 'or to classify or
> refer for employment any individual
> [because] of his ... sex.' ... This Court
> will not read the statute so as to make
> this additional language surplusage. ...
> It is certainly possible to give effect
> to this language. ... This Court
> understands the language 'or otherwise to
> discriminate' to modify the phrase 'to
> fail or refuse to refer for employment'
> and thereby to encompass prohibited
> discrimination with respect to referrals
> that fall short of failure or refusal to
> refer."

Id. at 817.

This court is not convinced that Congress intended the

broad phrase "or otherwise to discriminate" to be read so

narrowly.[9] Even on this narrow reading, however, the court

---

9.  At least one court has "noted that the meaning of
the phrase 'or otherwise to discriminate' is not
elucidated by legislative history." Vick v. Texas
Employment Com'n, 514 F.2d 734, 736 (5th Cir. 1975).

35

finds that § 2000e-2(b) authorizes sexual harassment claims against employment agencies.  For example, this reading would clearly bar so-called "quid pro quo" harassment; if an employment agency cannot refuse to refer on the basis of sex, it certainly cannot demand sexual favors as a prerequisite for a referral.  Furthermore, the court finds it unreasonable to assume that Congress intended that a prospective employee must endure a sexually "hostile environment" in order to obtain employment, when the same conditions would give rise to a cause of action in a place of employment.  The Eleventh Circuit Court of Appeals has cautioned against "a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." <u>Henson v. City of Dundee</u>, 682 F.2d 897, 902 (11th Cir. 1982).  This court will not assume that Congress nonetheless intended to allow that the same gauntlet be run in return for the privilege of being referred to employment.

"Control over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer." Zaklama v. Mt. Sinai Medical Center, 842 F.2d 291, 294 (11th Cir. 1988) (citation omitted). Courts have recognized that, through Title VII, "Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to him." Id. (citation omitted). Indeed, Title VII "addresse[s] itself directly to the problems of interference with the direct employment relationship by ... employment agencies--institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties." Sibley Memorial Hospital v. Wilson, 488 F.2d 1338, 1342 (D.C. Cir. 1973). "To permit a covered [entity] to exploit circumstances peculiarly affording it the capability of discriminatorily interfering

with an individual's employment opportunities with [an] employer ... would be to condone continued use of the very criteria for employment that Congress has prohibited." Zaklama, 842 F.2d at 294 (citation omitted). An employment agency may so interfere in its failure or refusal to refer an individual for employment. But an agency may also interfere by requiring an individual to endure a sexually hostile environment in order to obtain such a reference. Such a possibility is of particular concern when, as here, employment assistance is one component of a multi-week on-site training program operated by the agency. Although such discrimination may "fall short of failure or refusal to refer," Kellam, 866 F. Supp. at 817, it is an example of "otherwise discriminat[ing]" because of sex, and thus actionable under § 2000e-2(b).[10]

_____

10. Of course, a hostile environment will not always fall short of a failure to refer. In this case, the plaintiff has alleged that the environment was sufficiently hostile to cause a reasonable person to quit (i.e. that she was "constructively discharged" from the employment agency).

Finally, defendants contend that neither ADECA nor ADPE is liable to Wilborn under Title VII.  As noted by defendants, all of Wilborn's claims are based on allegations that Lee and Conaway sexually harassed her, otherwise discriminated against her on the basis of sex, and retaliated against her for reporting said harassment and discrimination.  Defendants claim that, "Lee and Conaway were agents or servants solely of Southern Union," and not of either ADECA or ADPE.  Def.'s Br. at 14.

Courts "accord a liberal construction to the term 'employer' under Title VII."  <u>Lyles v. City of Riviera Beach</u>, 166 F.3d 1332, 1341 (11th Cir. 1999).  "In keeping with this liberal construction, ... [the Eleventh Circuit Court of Appeals has] identified three circumstances in which it is appropriate to [treat] multiple entities [as an employer] for the purposes [of Title VII]."  <u>Id.</u>[11]  First

---

11.  <u>See</u> <u>also</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998) (upholding the foundational principle that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile (continued...)

is the "single employer" test: "where two ostensibly separate entities are highly integrated with respect to ownership and operations, [courts] may ... [treat them as one employer] under Title VII." Id. (citations and quotation marks omitted). Second is the "joint employer" test: "where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as 'joint employers.'" Id. Third is the "agency" test: "where an employer delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer." Id. Although her brief is hardly a model of clarity on this issue, Wilborn apparently believes that she can establish that ADECA and ADPE are liable to her

_____

(...continued)
environment created by a supervisor with immediate (or successively higher) authority over the employee."). The related issue of whether Lee and Conaway were supervisors is addressed below.

40

under Title VII through each of these three tests.  Of
course, she need only show that she can satisfy one of the
tests to move forward against these defendants.

Wilborn has produced sufficient evidence from which a
reasonable juror could conclude that Southern Union and
ADECA were joint employers with respect to the Truck
Program.  "The joint employer concept recognizes that the
business entities involved are in fact separate." <u>Virgo v.</u>
<u>Riviera Beach Assocs.</u>, 30 F.3d 1350, 1360 (11th Cir. 1994)
(citation omitted).  The question is whether the entities
"share or co-determine those matters governing the
essential terms and conditions of employment."  <u>Id</u>.
(citation omitted). Whether an entity "retained sufficient
control is essentially a factual question."  <u>Id</u>.

While Truck Program employees, including Lee and
Conaway, received paychecks from Southern Union, all wages
and operational funds for the program came from ADECA.
Deposition and physical evidence indicate that ADECA
provided all application and enrollment forms; dictated the

rules and regulations for participant eligibility; and set minimum requirements for program enrollment and post-program employment. Truck Program participants also received grievance and complaint procedures from ADECA, which directed them to file discrimination complaints regarding "treatment" in the  program with ADECA's "Equal Opportunity/Grievance Officer." Pl.'s Ex. G at Dep. Ex. 24. Furthermore, it is significant that, in the grievance and complaint document, ADECA described itself as "a partner in the ... Alabama Career Centers located throughout the state." Id. Brown put it more strongly, describing Southern Union as "the physical agent for ADECA." Pl.'s Ex. G at 69:6.

By contrast, Wilborn has made little effort to direct the court to specific evidence from which a fact-finder could conclude that Southern Union delegated control over "the essential terms and conditions" of employment in the Truck Program to ADPE (joint employment test), or vice versa (agency test). If sufficient evidence of delegation

42

exists in either direction, the court has been unable to
locate it on its own.  Likewise, Wilborn has failed to meet
the more difficult challenge of establishing that these
"two ostensibly separate entities are highly integrated
with respect to ownership and operations" and thus a single
employer.[12]

To summarize, the court finds that Title VII prohibits
employment agencies from subjecting job-seekers to a

———————————

12. It is noteworthy that the burden on a plaintiff
is heightened when she attempts to establish that
"governmental subdivisions denominated as separate and
distinct under state law should ... be aggregated for
purposes of Title VII."  Lyles, 166 F.3d at 1345.  The
Eleventh Circuit Court of Appeals has held that, "where
a state legislative body creates a public entity and
declares it separate and distinct, that declaration
should be entitled to a significant degree of deference,
amounting to a presumption that the public entity is
indeed separate and distinct for purpose of Title VII."
Id. at 1344.  Although defendants have not pointed the
court to a legislative declaration that Southern Union
and ADPE are distinct entities, they have noted that "the
Alabama Supreme Court [has] upheld a judgment finding
that ... Alabama's postsecondary institutions did not
operate as  a single system for the purpose of tenure."
Holland v. Pearson, 20 So.3d 120, 122 (Ala. Civ. App.
2008) (citing Hulcher v. Taunton, 388 So.2d 1203 (Ala.
1980)).

43

sexually hostile environment.  A jury must decide whether
the Truck Program operated as an employment agency with
respect to Wilborn.  A jury must also decide whether
Southern Union and ADECA were joint employers with respect
to the Truck Program, and thus whether ADECA may be liable
to Wilborn for the alleged violations of Title VII.
However, summary judgment will be granted on Wilborn's
Title VII claims against ADPE.

The court now turns to the merits of Wilborn's Title
VII claims.

### b. Merits of Title VII Claims

### i. Sexual Harassment

In order to bring a successful "hostile-environment
sexual-harassment claim under Title VII," a plaintiff must
establish the following:

> "(1) that ... she belongs to a protected
> group; (2) that [she] has been subject to
> unwelcome sexual harassment, such as
> sexual advances, requests for sexual
> favors, and other conduct of a sexual
> nature; (3) that the harassment must have
> been based on the sex of the employee;

44

>(4) that the harassment was sufficiently
>severe or pervasive to alter the terms
>and conditions of employment and create
>a discriminatorily abusive working
>environment; and (5) a basis for holding
>the employer liable."

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir.

1999) (en banc).  Defendants address only the fourth and

fifth factors, arguing that Wilborn's claim "fails because

the alleged harassment was not sufficiently severe or

pervasive and she failed to use the grievance procedures

for reporting such harassment."  Def.'s Br. at 16.

It is well-established that Title VII "does not reach

genuine but innocuous differences in the ways men and women

routinely interact with members of the same sex and of the

opposite sex."  Oncale v. Sundowner Offshore Servs., 523

U.S. 75, 81 (1998).  "The prohibition of harassment on the

basis of sex requires neither asexuality nor androgyny in

the workplace; it forbids only behavior so objectively

offensive as to alter the 'conditions' of the victim's

employment."  Id.  "The employee must 'subjectively

perceive' the harassment as sufficiently severe and

pervasive to alter the terms or conditions of employment and this subjective perception must be objectively reasonable." <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798 (11th Cir. 2010) (en banc) (citation omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview." <u>Oncale</u>, 523 U.S. at 81  (citations and quotation marks omitted).

The Supreme Court has "emphasized ... that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" <u>Id</u>.; <u>see also Reeves</u>, 594 F.3d at 808 ("[T]he evidence of harassment is considered both cumulatively and in the totality of the circumstances."). This "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." <u>Oncale</u>,

523 U.S. at 81.   "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."   Id. at 81-82.   "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between teasing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."   Id. at 82.

While courts are "directed ... to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,'" special attention is given to four factors: "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"   Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citation omitted).   Of course, when

47

"isolated incidents [are] extremely serious ... [they may]
amount to discriminatory changes in the 'terms and
conditions of employment.'" Id. at 788; see also Reeves,
594 F.3d at 808 ("Either severity or pervasiveness is
sufficient to establish a violation of Title VII.").

In this case, Wilborn alleges that from the first day
of the training program, Lee was "constantly telling nasty
jokes; constantly," pl.'s dep. at 170:19-20, and that these
jokes were often "pertaining to women [and to] parts of
their body," id. at 172:6-7. "[W]ords and conduct that are
sufficiently gender-specific and either severe or pervasive
may state a claim of a hostile work environment, even if
the words are not directed specifically at the plaintiff."
Reeves, 594 F.3d  at 811. "Similarly, words or conduct
with sexual content that disparately expose members of one
sex to disadvantageous terms or conditions of employment
may also support a claim under Title VII." Id. (citing
Petrosino v. Bell Atlantic, 385 F.3d 210, 222 (2d Cir.
2004) for the proposition that, when "[t]he depiction of

48

women in ... offensive jokes and graphics was uniformly sexually demeaning[,] ... [it] communicated the message that women as a group were available for sexual exploitation by men.").

Of course, Lee did more than simply joke about women. Some of his demeaning comments were specifically directed at Wilborn, and implied that <u>because of her sex</u> she did not belong in the program.  During her initial interview he told her, "young lady, you look like you should be at home making babies instead of trying to drive a truck."  Pl.'s Ex. A at 57:19-22.  He repeated the sentiment following her road test, and just before she quit the program, telling her, "see, I told you some women are supposed to be at home making babies instead of trying to drive a truck."  <u>Id</u>. at 206:13-16.  Offensive and discriminatory in themselves, these comments also provide a basis for finding discriminatory intent in Lee's "constant" jokes about women.

And the harassment was not limited to verbal behavior.

Rather, the gender-specific jokes and demeaning comments were combined with objectionably offensive touching, which continued despite Wilborn's protests.

Regardless of the frequency of the offensive, gender-specific comments and unwanted touching, a reasonable jury could conclude that the inexplicable classroom screening of a pornographic film depicting women and animals engaged in sexual activity was "severe ... enough to create ... an environment that a reasonable person would find hostile or abusive." Oncale, 523 U.S. at 81. And the severity of this conduct was amplified by Conaway's statement in reference to images of a woman having sex with a horse: "I bet you never had one that big, Selenia." Pl.'s Ex. A at 180:2-4. In making this statement, Conaway directly connected the images on the screen--images of bestiality--to the only woman in the room.

The fact that Wilborn was, at all relevant times, the only woman in the room must also be considered, as it was part of "social context in which particular behavior

occur[ed] and [was] experienced by its target." <u>Oncale</u>,
523 U.S. at 81.  It is not unreasonable to conclude that a
woman (or man) suffers gender-specific harassment more
acutely when isolated among members of the opposite sex.

Viewing the totality of the evidence in the light most
favorable to Wilborn, a reasonable jury could conclude that
the alleged harassment was sufficiently severe and
pervasive to amount to a violation of Title VII.[13]  This,
however, does not end the court's severity analysis.  For
Wilborn ultimately resigned from the Truck Program, and she
claims that the harassment was sufficiently severe to
amount to a constructive discharge.

The Supreme Court has recognized that "constructive
discharge resulting from sexual harassment, or 'hostile
work environment,' attributable to a supervisor" is "one
subset of Title VII constructive discharge claims."

───────────────────

13.  There is no dispute the Wilborn <u>subjectively</u>
<u>perceived</u> the harassment as sufficiently severe and
pervasive to alter the terms and conditions of
employment.

51

Pennsylvania State Police v. Suders, 542 U.S. 129, 143 (2004).  As discussed above, "[f]or an atmosphere of sexual harassment or hostility to be actionable ... the offending behavior 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Id. at 146-47 (citation omitted).  "A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  Id. at 147.

Once again viewing the totality of the evidence in the light most favorable to Wilborn, this court finds that a reasonable jury could conclude that the alleged harassment was sufficiently severe and pervasive to cause a reasonable person to quit.  The court now turns to the issue of liability.

The Supreme Court has held that, "An employer is subject to vicarious liability to a victimized employee for

an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998). However, "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." <u>Id</u>. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Id</u>.

As a preliminary matter, the court must address whether Lee and Conaway acted as "supervisors" with respect to Wilborn. The Eleventh Circuit Court of Appeals has "held that 'a 'supervisor' is not merely a person who possesses authority to oversee [a] plaintiff's job performance but a person with the power directly to affect the terms and

53

conditions of the plaintiff's employment.'" <u>Lewis v. United States DOL</u>, 2010 WL 638564 at *9 (11th Cir. Feb. 24, 2010) (quoting <u>Bryant v. Jones</u>, 575 F.3d 1281, 1300 (11th Cir. 2009)).  While the Court of Appeals has done little to elaborate on what constitutes a "power directly to affect the terms and conditions of the plaintiff's employment," even under a narrow reading, a reasonable jury could conclude that Lee and Conaway were supervisors.[14]  <u>Compare Parkins v. Civil Constr., Inc.</u>, 163 F.3d 1027, 1043 (7th Cir. 1998) ("This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee."), <u>with</u> <u>Dinkins v. Charoen Pokphand USA, Inc.</u>, 133 F. Supp. 2d 1254, 1266 (M.D. Ala. 2001) (DeMent, J.) ("[A]n employee is a supervisor ... for purposes of Title VII if he has the actual authority to take tangible employment actions ... <u>or</u> to direct another employee's day-

---

14.  Although a broader interpretation is perhaps most consistent with <u>Faragher</u>, 524 U.S. at 781, where the Supreme Court found that an employee "responsible for making ... daily assignments, and for supervising [other employees'] work and fitness training" was a supervisor.

to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks.") (emphasis added). Truck Program participants were required to pass multiple written and performance tests to complete the program, and Lee and Conaway each administered and graded one or more of those tests. Thus, each had the ability to increase her workload and to prevent her from completing the program.

Turning to the first prong of the affirmative defense, there is ample evidence from which a jury could conclude that the defendants failed to exercise reasonable care to prevent and correct sexual harassment. To be sure, it is undisputed that Wilborn received two separate documents describing grievance procedures. Moreover, she provided written acknowledgment of her receipt of each policy. The mere existence of a written anti-harassment policy, however, is not "sufficient ... to establish the first prong of [the] affirmative defense." Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1237, 1251 (M.D. Ala.

2001) (DeMent, J.).  Rather, the burden is on the employer "to show that its sexual harassment policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect." Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1314 (11th Cir. 2001).  Of course, "[a] policy is 'defective' if those responsible for its enforcement lack training and knowledge sufficient to recognize, prevent, and correct workplace discrimination."   Dinkins 133 F. Supp. 2d at 1252.

The Equal Employment Opportunity Commission has issued enforcement guidance on the issue of vicarious liability for unlawful harassment by supervisors.  See EEOC Notice 915.002  (July  18,  1999),  available  at http://www.eeoc.gov/policy/docs/harassment.html  (last modified June 21, 1999).  "As an 'administrative interpretation of [Title VII] by the enforcing agency,' [this guidance], 'while not controlling upon the courts by reason of [its] authority, do[es] constitute a body of

experience and informed judgment to which courts and litigants may properly resort." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986) (citations omitted); see also Dinkins, 133 F. Supp. 2d at 1251 (citing EEOC Notice 915.002 as a persuasive authority). According to the EEOC, "[a]n anti-harassment policy and complaint procedure should contain, at a minimum, ... [a] clear explanation of the prohibited conduct ... [and a] clearly described complaint process that provides accessible avenues of complaint." EEOC Notice 915.002 at V.C.1. "Moreover, reasonable care in preventing and correcting harassment requires an employer to instruct all supervisors to report complaints of harassment to appropriate officials." Id. at V.C.1.c.[15] "An employer should ensure that its supervisors and managers understand their responsibilities under the

---

15. See also EEOC Notice at V.C.2. ("An employer's duty to exercise due care includes instructing all of its supervisors and managers to address or report to appropriate officials complaints of harassment regardless of whether they are officially designated to take complaints.") (emphasis added).

57

organization's anti-harassment policy and complaint procedure." <u>Id</u>. at V.C.2.  To achieve this end, an employer should periodically train its managers and supervisors, "explain[ing] the types of conduct that violate the employer's anti-harassment policy; the seriousness of the policy; [and] the responsibilities of supervisors and managers when they learn of alleged harassment." <u>Id</u>.

In this case, only the ADECA policy refers specifically to discrimination.  However, neither the word "harassment" nor a description of what might constitute harassment appears in the policy.  And Wilborn has raised questions of fact with respect to whether any program official adequately explained sexual harassment or the ADECA policy to her.  She has testified that when Brown distributed the policy, he only briefly discussed it, "hitting points here and there."  Pl.'s Ex. A at 253:19.  This testimony is consistent with Brown's admission that he did not discuss the policy or sexual harassment "in depth," Pl.'s Ex. G at

28:5.   Indeed, Brown himself had never received any training on sexual harassment.

Even if the ADECA policy adequately explained harassment, all the evidence before the court indicates that the policy was not effectively published.  Although Wilborn admits that she read and signed the policy, the document was immediately collected by Brown and never returned to her.  Defendants have provided no evidence that the policy was posted in program facilities, or that it was otherwise readily available to Wilborn or other participants.  Compare  Jackson v. Cintas Corp., 391 F. Supp. 2d 1075, 1091-92 (M.D. Ala. 2005) (DeMent, J.) (noting that "some district courts have concluded that 'simply posting one's harassment policy on a bulletin board in a central location is enough to establish a reasonable dissemination of the policy'") (citations omitted).

The failure to publish adequately the ADECA policy is amplified by the fact that the policy directs program participants to file discrimination complaints with Lillian

Patterson at an address in Montgomery, Alabama.  There is no evidence that Patterson ever visited the program, that Wilborn ever met Patterson, or that Wilborn otherwise knew how to contact Patterson.[16]   See Madray v. Pulbix Supermarkets, Inc., 208 F.3d 1290, 1298 (11th Cir. 2000) (finding a policy adequate in part because "designated, appropriate company representatives were accessible to ... store employees"); Wilson v. Tulsa Junior College, 164 F.3d 534, 541 (10th Cir. 1998) (finding a policy deficient in part because employees were directed to make complaints to an official who was "located in a separate facility" and inaccessible during some work hours).

Of course, Wilborn was aware of an alternative procedure.  The Truck Program orientation materials informed her that she could bring any complaints to either Lee or Conaway, her instructors, or to Brown, her

_____

16. It is noteworthy that, upon examining the ADECA policy during her deposition, Wilborn testified that she might have contacted Patterson if she had possessed a copy of the policy.

60

caseworker.  All three of the men were readily available, and Wilborn knew how to contact them.  Lee and Conaway, however, were the subjects of her complaints.  And, as noted above, Brown admitted that he had never received any training on sexual harassment.

Even if there were no disputed issues of fact with respect to the first prong of the affirmative defense, a reasonable jury could conclude that Wilborn did not "unreasonably fail[] to take advantage of any preventive or corrective opportunities provided by the [defendants]." Faragher, 524 U.S. at 807.  Wilborn has testified that she took advantage of such opportunities--limited though they were--by making oral and written complaints to Brown.

Defendants make much of the fact that Wilborn did not file grievances with either Patterson or Edwards.  As suggested above, the court is unwilling to conclude on summary judgment that Wilborn's failure to contact Patterson was unreasonable.  The ADECA policy was not

adequately published and there is no evidence that Wilborn
otherwise knew how to contact Patterson.

Nor was the failure to contact Edwards was
unreasonable. While the orientation packet directed
Wilborn to bring any complaints about her instructors to
Brown, there was no such instruction to contact Edwards.
Rather, the plain language of the written procedure
directed that in the case of a grievance, she should take
the initiative and "<u>talk</u> with [her] immediate instructor";
"<u>discuss</u> it with the lead instructor"; and, "<u>discuss</u> the
situation with [her] Case Manager." Pl.'s Ex. B. at Dep.
Ex. 1 (emphasis added). But, according to the text, no
further effort by the aggrieved individual is required.
Rather, "If there is still no satisfaction, the Training
Coordinator <u>will be called in to resolve the situation</u>."
<u>Id</u>. (emphasis added). Thus, Wilborn arguably followed
procedure by bringing her complaints to Brown.

In short, a reasonable jury could conclude that
defendants are not entitled to the <u>Faragher</u> affirmative

defense.  For this reason, and others discussed above, summary judgment will be denied with respect to Wilborn's Title VII sexual harassment claim against Southern Union and ADECA, including her claim that the harassment was sufficiently severe to amount to a constructive discharge.

### ii.  Sex Discrimination

In addition to her sexual harassment claim, Wilborn alleges that defendants otherwise discriminated against her in violation of the substantive provisions of Title VII. Although the court has struggled to separate this claim from her harassment claim, it is apparently based on allegations that defendants terminated Wilborn from the Truck Program because of her sex.[17]

To make out a prima facie case of sex discrimination in violation of Title VII, Wilborn must show that "she was

---

17.    See Pl.'s Br. at 53 ("Evidence has been submitted that Lee ... terminated [Wilborn] from the program. ... She clearly suffered an adverse employment action as she was effectively prevented from pursuing [available] employment opportunities by the actions of the defendants.").

a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). This standard "require[s] an employee to establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). In the employer context, "ultimate employment decisions [are] those 'such as termination, failure to hire or demotion.'" Id. (citation omitted). In the employment agency context, termination from a training program prior to receiving a referral surely qualifies as an adverse employment action.

In this case, however, Wilborn has not alleged sufficient facts from which a reasonable jury could conclude that she was terminated from the Truck Program. Rather, the evidence before the court, including Wilborn's own testimony, indicates that she withdrew from the

program.[18]   For this reason, summary judgment will be granted with respect to her claim that defendants discriminated against her on the basis of sex by terminating her from the program.[19]

### iii.  Retaliation

Wilborn also claims that she was the victim of adverse retaliatory action, in violation of Title VII.  42 U.S.C. § 2000e-3(a) makes it "an unlawful employment practice" for

---

18. It is also noteworthy, although not decisive, that Wilborn's complaint makes no reference to termination.  Rather, it alleges that, "As a result of the continued sexual harassment, sex discrimination and retaliation, [Wilborn] withdrew from the program on August 3, 2007, as she could no longer endure the sexually hostile and retaliatory environment."  Am. Compl. at ¶ 59 (emphasis added); see also id. at ¶ 103 ("As a result of these Defendants subjecting [Wilborn] to sexual harassment, sex discrimination and retaliation she withdrew from the employment program under circumstances in which a reasonable person would have felt compelled to resign.  Thus, these Defendants have constructively discharged [her].").

19. Of course, as discussed in the previous section, she may nonetheless proceed on her hostile-environment constructive discharge claim.

an employment agency to "discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by [Title VII,] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  "A prima facie case of retaliation under [§ 2000e-3(a)] requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered [a materially adverse] action; and (3) there was a causal connection between the protected activity and the adverse ... action."  Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008); see also Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 66 (2006).[20]

The substance of the alleged retaliatory action is unclear in Wilborn's complaint.  But her brief in response

_____

20.  "[T]he Burlington Court effectively rejected the standards applied by [the Eleventh Circuit Court of Appeals] ... that required an employee to show either an ultimate employment decision or substantial employment action to establish an adverse employment action for the purpose of a Title VII retaliation claim."  Crawford, 529 F.3d at 973-74.

to the motion for summary judgment clarifies the complaint,
arguing that "a reasonable juror could find that being
terminated from an occupational program and the related
loss of two conditional offers of employment would dissuade
[a person] from making a complaint of sexual harassment or
discrimination." Pl.'s Br. at 56. While termination would
surely qualify as a materially adverse action, Wilborn quit
the program and thus has failed to allege a prima facie
claim of retaliation.


## 2. Title IX

Wilborn's Title IX claims mirror those she raises
pursuant to Title VII; she alleges that Southern Union and
ADECA are liable for sexual harassment, sex discrimination,
and retaliation.[21]   Defendants argue that Wilborn's Title

---

21. Wilborn also brings Title IX claims against ADPE.
However, the court has already determined that Wilborn
failed to offer evidence from which a reasonable juror
could conclude that ADPE and Southern Union were a single
employer, joint employers, or in an agency relationship
with respect to the Truck Program. As Wilborn offers no
(continued...)

IX claims are preempted by Title VII and, furthermore, that her claims fail on the merits.  The court first addresses the preemption issue, and then turns to the merits of her Title IX claims.

### a.  Preemption

"Title IX prohibits sex discrimination by recipients of federal education funding." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005).  "The statute provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" Id. (quoting 20 U.S.C. § 1681(a)).[22]  The

_____

(...continued)
other basis for ADPE's liability under Title IX, summary judgment will be granted on these claims with respect to ADPE.

22. It is undisputed that the Truck Program, Southern Union and ADECA received federal financial assistance. It is also undisputed that the Truck Program was an "educational program" for purposes of Title IX.

68

Supreme Court has "held that Title IX implies a private right of action ... [and] that it authorizes private parties to seek monetary damages for intentional violations of Title IX." Id. (citations omitted).

Despite the broad language of Title IX, some circuit courts have held "that Congress intended Title VII to exclude a damage remedy under Title IX for individuals alleging employment discrimination." Lakoski v. James, 66 F.3d 751, 755 (5th Cir. 1995); see also Delgado v. Stegall, 367 F.3d 668, 670 (7th Cir. 2004) ("[S]exual harassment of university employees is not actionable under Title IX if the employee could obtain relief under Title VII."). In reaching this holding, the Fifth Circuit Court of Appeals accepted that, "[a]lthough phrased differently, both Title VII and Title IX protect individuals from employment discrimination on the basis of sex." Lakoski, 66 F.3d at 756. But the court also found that "the Title IX right to be free from sex discrimination in employment is no different from the Title VII right." Id. Thus, in most

cases, an <u>employment</u> discrimination claim cognizable under Title IX could also be asserted under Title VII.  Working from this finding, the court explained that if employment discrimination that violates Title VII could be asserted under Title IX, "a complainant could avoid most if not all of [Title VII's] detailed and specific provisions of ... law [and] ... could completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII."  <u>Id</u>. at 755.[23]  The court did not accept "that Congress offered Title IX to employees of federally funded educational institutions so as to provide a bypass to Title VII's administrative

_____

23. <u>See, e.g.</u>, <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 44 (1974) ("Cooperation and voluntary compliance were selected as the preferred means for achieving [Title VII's goals].  To this end, Congress created the Equal Employment Opportunity Commission and established a procedure whereby existing state and local equal employment agencies, as well as the Commission, would have an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party was permitted to file a lawsuit.").

procedures," and therefore arrived at the above-stated holding.

Although neither the Supreme Court nor the Eleventh Circuit Court of Appeals has directly addressed this issue, "various district courts within the Eleventh Circuit ... have [persuasively] held that Title VII preempts Title IX and provides the exclusive remedy for employment discrimination claims against federally funded education programs." Schultz v. Bd. of Trustees of Univ. of West Florida, 2007 WL 1490714 at *2 (N.D. Fla. May 21, 2007) (Smoak, J.) (citing Hankinson v. Thomas County Sch. Dist, 2005 U.S. Dist. LEXIS 25576 (M.D. Ga. Oct. 28, 2005) (Lawson, J.); Morris v. Wallace Cmty. College-Selma, 125 F. Supp. 2d 1315 (S.D. Ala. 2001) (Vollmer, J.); Blalock v. Dale County Bd. of Educ., 84 F. Supp. 2d 1291 (M.D. Ala. 1999) (DeMent, J.); Hazel v. School Bd. of Dade County, (S.D. Fla. 1998) (Moore, J.); Gibson v. Hickman, 2 F. Supp. 2d 1481, 1484 (M.D. Ga. 1998) (Owens, J.)).

This court, however, need not reach the preemption issue, as it finds that Wilborn's case is distinguishable from those cited above.  Unlike the plaintiffs in those cases, all of whom were employees asserting claims against their employers, Wilborn is a <u>student</u> asserting claims against a federally funded education program.  Moreover, although her Title VII and Title IX claims are based on the same set of facts, the latter set of claims clearly assert discrimination with respect to her <u>education</u>, not her employment.[24]  <u>Cf. Delgado v. Stegall</u>, 367 F.3d 668, 670

---

24. <u>Compare</u> <u>Lakoski</u>, 66 F.3d at 752 (Plaintiff "alleg[ed] that the University intentionally discriminated against her on the basis of sex in denying her tenure."); <u>Schultz</u>, 2007 WL 1490714 at *2 n.3 ("The allegations constituting the Title VII and XI claims are identical.  Both claims allege that the University has discriminated 'against Schultz because of her sex in the terms, conditions and privileges of her employment.'") <u>Hankinson</u>, 2005 U.S. Dist. LEXIS 25576 at *6 ("[T]he portion of Plaintiff's Title IX damage claim that alleges Defendant discriminated against her individually, in failing to offer her the same employment opportunities that it offered her male counterparts, is preempted by Title VII."); <u>Blalock</u>, 84 F. Supp. 2d at 1298 ("[I]n her Title IX claim[,] ... Plaintiff alleges that she 'has been discriminated against in employment based on ...
(continued...)

72

(7th Cir, 2004) ("We cannot find any cases dealing with the question but it seems to us that harassment of a student interferes with her educational experience whether or not she is also a part-time employee."). Unlike Title IX, Title VII provides no cause of action for discrimination that interferes with an individual's education, and thus cannot be read as preempting such a claim. For this reason, the court rejects defendants' preemption argument.

### b. Injunctive Relief Under Title IX

Before turning to the merits of Wilborn's Title IX claims, the court addresses whether she has standing to pursue her prayer for injunctive relief under the statute. "[B]ecause the constitutional standing doctrine stems directly from Article III's 'case or controversy' requirement, ... [it] implicates [the court's] subject matter jurisdiction, and accordingly must be addressed as a threshold matter regardless of whether it is raised by

_____

(...continued)
sex.'").

73

the parties." Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242 (11th Cir. 2003).

As she summarized in her brief, Wilborn has requested "specific injunctive relief related to the implementation and monitoring of anti-discrimination policies and procedures for the defendant entities in receipt of federal funds." Pl.'s Br. at 56. "As an irreducible minimum, Article III requires a plaintiff to meet three standing requirements." Williams v. Bd. of Regents, 477 F.3d 1282, 1302 (11th Cir. 2007). Among these requirements is a "show[ing] that it is likely, rather than speculative, that a favorable decision will redress her injury." Id. "Additionally, '[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate--as opposed to a merely conjectural or hypothetical--threat of future injury.'" Id. (citation omitted).

In this case, Wilborn "lack[s] standing to pursue [the requested] injunctive relief because the threat of future harm to [her] and other students is merely conjectural." Id. at 1303.  Lee and Conaway are no longer employed by any defendant.  "Therefore, as for harm that may come from them, granting injunctive relief would not prevent future harm to [Wilborn] or other students or remedy the past harm [she] suffered."  Id.  Moreover, Wilborn is no longer a participant in any educational program administered by the defendants, nor has she alleged a plan to become such a participant in the future.  Consequently, the relief she requests will not protect her from future injury.

### c.  Merits of Title IX Claims

#### i.  Sexual Harassment

As noted above, the private right of action for monetary damages under Title IX is an implied right.  Over the course of several cases, the Court has "defined the contours of that right of action."  Jackson, 544 U.S. at 173; see also Gebser v. Lago Vista Indep. Sch. Dist., 524

75

U.S. 274, 284 (1998) ("Because the private right of action under Title IX is judicially implied, we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute."). For example, the Court has recognized that Title IX, like Title VII, "authorizes private parties to seek monetary damages for ... sexual harassment." Jackson, 544 U.S. at 173. As defined by the Court, however, Title IX's cause of action for sexual harassment differs in important respects from Title VII's parallel cause of action. Defendants maintain that these differences are material in Wilborn's case.

In contrast to its test for employer liability in Title VII sexual harassment cases, the Supreme Court has found that "it would 'frustrate the purposes' of Title IX to permit a damages recovery against a [recipient of federal funds] for a teacher's sexual harassment of a student based on principles of respondeat superior or constructive notice." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 285 (1998); compare Faragher, 524 U.S. at 807 (Under

Title VII "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."). The Court explained that "the express remedial scheme under Title IX is predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation, 20 U.S.C. § 1682 ... [and concluded that] in the absence of further direction from Congress, ... the implied damages remedy should be fashioned along the same lines." Gebser, 524 U.S. at 290. "An 'appropriate person' under § 1682 is, at minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Id. Working from this understanding of the statute's remedial scheme, the Court held that "a damages remedy will not lie under Title IX unless an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of

discrimination in the recipient's programs and fails adequately to respond." Id. "[M]oreover ... the response must amount to a deliberate indifference to discrimination." Id.

Thus, to survive summary judgment on her Title IX sexual harassment claim--at least with respect to her claim for damages--Wilborn must produce sufficient evidence that: (1) an "appropriate person" at Southern Union or ADECA had actual notice of the discrimination, and (2) once an "appropriate person" had actual notice, that person was deliberately indifferent to the harassment. See Sauls v. Pierce County Sch. Dist., 399 F.3d 1279, 1284 (11th Cir.

2005).[25]   For the sake of clarity, the court addresses
Southern Union and ADECA separately.

   Southern Union: Wilborn has testified that she
repeatedly made complaints about the alleged harassment to
Brown.   To be sure, Brown lacked the power to fire or
discipline the alleged perpetrators of the harassment.
However, Wilborn has offered evidence that Southern Union
granted him the power, and imposed the obligation, to
collect complaints from program participants and report
them to Southern Union officials endowed with the power to
fire or discipline.   Moreover, while it was not Brown's job
to directly supervise program instructors, such supervision

---

   25. The Eleventh Circuit Court of Appeals has held
that, in cases of "involv[ing] teacher-on-student
harassment, [a plaintiff] need not establish [that the
alleged] misconduct was 'so severe, pervasive and
objectively offensive' that it denied [her] equal access
to educational programs or opportunities." Sauls, 399
F.3d at 1284.   Nonetheless, and out of an abundance of
caution, the court notes that it has already found that
a reasonable juror could conclude that the alleged
harassment was sufficiently severe to support a Title VII
claim.   Were it required, the court would reach the same
conclusion with respect to her Title IX harassment claim.

was a de facto result of his duty to record and report on
the experiences and progress of the participants.    A
reasonable juror could conclude from these facts that Brown
thus had the requisite authority to take corrective action
to end the harassment.  See Warren v. Reading Sch. Dist.,
278 F.3d 163, 173 (3d Cir. 2002) ("The authority to
supervise a teacher and to investigate a complaint of
misconduct implies the authority to initiate corrective
measures such as reporting her findings to her superior.").

The conclusion that Brown was an appropriate person
with respect to Southern Union is buttressed by the fact
that the Truck Program's written grievance policy directed
participants to bring to Brown those complaints that they
could not resolve in class.    This suggests, and a
reasonable jury could conclude, that Brown was internally
viewed as an appropriate person to institute corrective
measures on Southern Union's behalf.

Moreover, and as discussed in the court's Title VII
analysis, the text of the program's grievance policy

80

strongly suggests that once a participant lodged a complaint with Brown, she need take no further initiative to set corrective measures in motion. Rather, "the Training Coordinator will be called in to resolve the situation." Pl.'s Ex. B at Dep. Ex. 1.[26] While, "the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX," Gebser, 524 U.S. at 292, a recipient of federal funds should not be able to construct a grievance procedure so as to shield itself from Title IX liability.

It is undisputed that Brown took no action on Wilborn's grievances until after she had quit the program. A total failure to act in the face of repeated complaints is the very definition of deliberate indifference.

Summary judgment will be denied with respect to Wilborn's Title IX sexual harassment claim for damages

─────────────────────

26. Wilborn also testified, "Once I reported it to Mr. Brown, I just felt like he was going to take the necessary steps to report it to whoever it needed reporting to." Pl.'s Ex. A at 258:1-4. Given the text of the policy, this belief was reasonable.

against Southern Union.

ADECA: Wilborn contends that, if Brown is an appropriate person with respect to Southern Union, he must also be an appropriate person with respect to ADECA. She bases this argument on her assertion that ADECA and Southern Union were joint employers of Brown and other Truck Program staff.

Resolving the issue of joint employment, however, does not resolve the issue of Title IX liability. Gebser, 524 U.S. at 285 ("[I]t would frustrate the purposes of Title IX to permit a damages recovery against a [recipient of federal funds] for a teacher's sexual harassment of a student based on principles of respondeat superior or constructive notice."). And in this case, some of the very factors that suggest that Brown was an appropriate person with respect to Southern Union are absent with respect to ADECA. As noted by defendants, "Wilborn cites no portion of any ... polic[y] ... that would require Brown to report any alleged complaint of sexual harassment to anyone other

than ... Southern Union." Def.'s Br. at 11.  And the court

is aware of no other evidence that Brown was obligated to

report complaints of harassment to ADECA.  Moreover, ADECA

developed its own grievance policy, which explicitly

directed that all complaints of discrimination be reported

to Lillian Patterson.   Thus, at least with respect to

discrimination, it would appear that ADECA intended to

over-ride the program's more general grievance procedure.

For these reasons, the court finds insufficient

evidence to support a conclusion that Brown was an

appropriate person with respect to ADECA.  Summary judgment

will be granted with respect to Wilborn's Title IX

harassment claim for monetary damages against ADECA.

## ii.  Sex Discrimination

As was the case in its Title VII analysis, the court

has struggled to separate Wilborn's Title IX

"discrimination" claim from her harassment claim.  Her

brief provides little assistance, as it notes only that "a

Title IX sex discrimination claim is analyzed under the

same framework as a Title VII sex discrimination claim" and "respectfully refers the Court to her ... Title VII sex discrimination argument." Pl.'s Br. at 60. Thus, the court can only conclude that this claim is also based on Wilborn's supposed "termination" from the Truck Program. Because Wilborn quit the program, summary judgment will be granted with respect to this claim.

### iii.  Retaliation

Wilborn's Title IX retaliation claim also appears to be based on the assertion that she was terminated from the Truck Program. See Pl.'s Br. at 61 ("[A] reasonable juror could easily find a causal connection between the plaintiff's complaints of sexual harassment and the defendants['] termination of her from their program."). Because Wilborn quit the program, summary judgment will be granted on this claim as well.

### 3. Equal Protection

Wilborn brings claims against Lee and Conaway in their individual capacities, alleging violations of the 14th Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983.  Specifically, Wilborn alleges that each man sexually harassed, discriminated and retaliated against her in violation of her constitutional right to equal protection.  Although defendants moved for summary judgment on these claims, they offered little argument specific to them.[27]

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of

---

27.  In fact, defense counsel made no direct reference to Wilborn's § 1983 claims in their brief in support of the motion for summary judgment.  After Wilborn referenced this deficiency in her response brief, defendants replied that they had "clearly moved for summary judgment with respect to each and 'every claim asserted against them.'" Def.'s Reply at 11 (Doc. No. 45) (quoting Mot. for Summ. J. at 1).  The court takes note of this exchange out of concern that counsel may have focused their attention on their institutional clients at the expense of their individual clients.

state law." <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).
Defendants make no attempt to contest Wilborn's assertion
that Lee and Conaway committed the alleged violations while
acting under color of state law, and the court sees no
reason to reach such a conclusion on its own.   Thus, the
court turns to whether Wilborn has alleged a violation of
a right secured by the constitution.

It is well-established that the Equal Protection Clause
protects individuals from sexual harassment committed by a
person acting under color of state law.   <u>See</u> <u>Downing v.</u>
<u>Board of Trustees of the Univ. Of Alabama</u>, 321 F.3d 1017
(11th Cir. 2003).   Moreover, the "elements of a sexual
harassment claim under Title VII and the Equal Protection
Clause are the same--meaning that the employee must prove
that the state actor intended to discriminate because of
the employee's sex."   <u>Id</u>. at 1024.   Under this analysis,
summary judgment will be denied with respect to Wilborn's
14th Amendment-based sexual harassment claim, just as it
was with respect to her Title VII-based sexual harassment

claim.

Wilborn's additional sexual discrimination and
retaliation claims apparently rely on her claimed
termination from the program. Because she quit the
program, summary judgment is due on these claims.[28]

## B. State Claims

Wilborn alleges that one or both of the individual
defendants, Lee and Conaway, committed various intentional
torts against her. She further claims that the
institutional defendants, Southern Union, ADECA and ADPE,
are vicariously liable for these torts.

Defendants maintain that the institutional defendants

---

28. The court also notes that retaliatory action is
not prohibited by the Equal Protection Clause. Watkins
v. Bowden, 105 F.3d 1344, 1354 (11th Cir. 1997) ("A pure
or generic retaliation claim ... simply does not
implicate the Equal Protection Clause."); Ratliff v.
Dekalb County, 62 F.3d 338, 341 (11th Cir. 1995) ("The
right to be free from retaliation is clearly established
as a first amendment right and as a statutory right under
Title VII; but no clearly established right exists under
the equal protection clause to be free from
retaliation.").

are shielded from suit by state sovereign immunity, and
that the individual defendants are likewise protected by
state agent immunity.  They also argue that Wilborn's tort
claims fail on the merits.

### 1. Immunity

### a. State Sovereign Immunity

"Under Ala. Const. of 1901, § 14, the State of Alabama
has absolute immunity from lawsuits."  <u>Ex parte Tuscaloosa</u>
<u>County</u>, 796 So. 2d 1100, 1103 (Ala. 2000).  "This absolute
immunity extends to arms or agencies of the state."  <u>Id</u>.
And, "'[a]bsolute immunity' means just that--the State and
its agencies are not subject to suit under any theory."
<u>Ala. Dep't of Corr. v. Montgomery County Comm'n</u>, 11 So. 3d
189, 191 (Ala. 2008).

Wilborn does not dispute that Southern Union, ADECA,
and ADPE are agencies of the state and therefore protected
by state immunity.  In fact, she explicitly "concedes any
monetary damages against these defendants under her Alabama
State law claims."  Pl.'s Br. at 62.  Nonetheless, Wilborn

maintains that her claims for injunctive relief are due to proceed under an exception to state sovereign immunity. She is incorrect.

To be sure, "caselaw going back nearly 40 years supports the proposition that the prohibition of § 14 [of the Alabama Constitution] is subject to certain exceptions." Ala. Dep't of Corr., 11 So. 3d at 194. But the Alabama Supreme Court has recently made clear that "the exceptions are relevant only as they relate to claims against State officials in their official capacities, not as they relate to the State agency or the State itself." Id. "For actions against the State or one of its agencies, there are no exceptions." Id.

Wilborn's complaint fails to name a single state official in his or her official capacity, and "[t]he jurisdictional bar of § 14 simply 'preclud[es] a court from exercising subject-matter jurisdiction' over [a] State or a State agency." Id. at 191-92 (citation omitted). "Any action taken by a court without subject-mater jurisdiction-

-other than dismissing the action--is void." Id. at 192.
For this reason, Wilborn's state-law claims against
Southern Union, ADECA and ADPE will be dismissed.

### b. State-Agent Immunity

The Alabama Supreme Court has held that, "A State agent
shall be immune from civil liability in his or her personal
capacity when the conduct made the basis of the claim
against the agent is based upon the agent's [engagement in
certain specified types of activities]." Ex parte Butts,
775 So. 2d 173, 177 (Ala. 2000) (citation omitted)
(emphasis in original). These activities include, inter
alia, the "exercising [of] judgment in the discharge of
duties imposed by statute, rule, or regulation in ...
educating students." Id. at 178. However, "a State agent
shall not be immune from civil liability in his or her
personal capacity:

> "(1) when the Constitution or laws of the
> United States, or the Constitution of
> [Alabama], or laws, rules, or regulations
> of [Alabama] enacted or promulgated for
> the purposes of regulating the activities

90

> of a          government agency
> require otherwise; or
>
> "(2) when the State agent acts willfully,
> maliciously, fraudulently, in bad faith,
> beyond his or her authority, or under a
> mistaken interpretation of the law."

Id. (emphasis in original).

The Alabama Supreme Court has "established a 'burden-shifting' process when a party raises the defense of State-agent immunity." Giambrone v. Douglas, 874 So. 2d 1046, 1052 (Ala. 2003) (citation omitted). "In order to claim State-agent immunity, the [defendant officials] bear the burden of demonstrating that [the plaintiff's] claims arise from a function that would entitle them to immunity." Id. "If the [defendants] make such a showing, the burden shifts to [the plaintiff]," who must show that the defendants actions fell into one of the two exceptions listed above.

Defendants argue that they have carried the initial burden because, "[a]s state instructors, Lee and Conaway were delegated the authority to use their judgment and discretion in order to run their classrooms." Def.'s Br.

at 28.   Even if this is true--and defendants provide no evidence in support of this assertion--Wilborn has presented sufficient evidence that the actions of Lee and Conaway, including sexually explicit jokes, unwanted touching and the displaying of pornographic videos, were violative of policies by which they were bound and thus exceeded their authority.

Both Lee and Conaway testified that they received on-going training on sexual harassment from Edwards.   When asked about the content of this training, Lee stated his understanding that, "Touching, dirty language, sexual innuendos about jokes or something of that nature" were all prohibited by policy.   Pl.'s Ex. C at 20:1-3.   He further stated that Edwards emphasized, "Definitely no touching." Id. at 20:3.   This description of prohibited activities essentially mirrors the alleged behavior that forms the basis of Wilborn's state tort claims.[29]

_____

29. Wilborn does not bring a state claim of sexual harassment because "[i]t is well settled that Alabama
(continued...)

A reasonable jury could thus conclude that, if Lee or Conaway engaged in the alleged behavior, it was "beyond his ... authority." Ex parte Butts, 775 So. 2d at 177. See Ex parte Yancey, 8 So. 3d 299, 306 (Ala. 2008) ("A State agent acts beyond authority and is therefore not immune when he or she fail[s] to discharge duties pursuant to detailed rules or regulations.") (citation and quotation marks omitted).  The court cannot, therefore, find that either Lee or Conaway is entitled to state-agent immunity.

## 2. Merits of State-Law Claims

### a.  Assault and Battery

Wilborn asserts a claim of assault and battery against Lee.  "The plaintiff in an action alleging assault and battery must prove '(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the

_____

(...continued)
does not recognize an independent cause of action for sexual harassment." Stevenson v. Precision Std., Inc., 762 So. 2d 820, 825 n.6 (Ala. 1999).  In Alabama "claims of sexual harassment are maintained under common-law tort theories such as assault and battery, invasion of privacy, ... and outrage." Id.  As discussed below, Wilborn's complaint asserts these three claims.

plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'" <u>Harper v. Winston County</u>, 892 So.2d 346, 353 (Ala. 2004) (citation omitted).  It is well-established that "[a]n actual injury to the body is not a necessary element of a civil assault and battery." <u>Surrency v. Harbison</u>, 489 So.2d 1097, 1104  (Ala. 1986).

Defendants do not, and cannot, argue that Wilborn has failed to allege that Lee intentionally touched her person. Wilborn has testified that Lee "popped her on the butt at least twice (once while remarking how 'sweet smelling' she was), pulled her pants out to expose her panties, and lifted her shirt up and touched her back."  Pl.'s Br. at 64.  Rather, defendants  argue that the touching was not sufficiently "severe" to support Wilborn's assault-and-battery claim.  <u>See</u> Def.'s Br. at 42.  In other words, defendants apparently contend that she has failed to present  evidence  that  the  alleged  touchings  were sufficiently "harmful" or "offensive."  Alabama caselaw, however, supports a contrary conclusion.

94

In <u>Ex parte Atmore Community Hosp.</u>, 719 So. 2d 1190, 1194 (Ala. 1998), the plaintiff "presented evidence indicating that [defendant] touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg."  The plaintiff "also presented evidence indicating that each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome."  <u>Id</u>.  The court concluded that "[t]hese factual assertions constituted substantial evidence that [defendant] committed a battery."  <u>Id</u>.

The evidence presented against Lee is sufficiently similar.  Summary judgment will be denied with respect to this claim.

### b.  Invasion of Privacy

Wilborn brings invasion-of-privacy claims against Lee and Conaway.  In Alabama, "the invasion of privacy tort consists of four distinct wrongs: 1) the intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates ordinary decencies; 3) putting the plaintiff

in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use." Phillips v. Smalley Maintenance Services, Inc., 435 So. 2d 705, 708 (Ala. 1983). Wilborn "claims invasion of privacy under the 'intrusion upon seclusion' theory." Pl.'s Br. at 64.

To succeed on a claim of intrusion upon seclusion "relating to sexual harassment, a plaintiff must show: (1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." Ex parte Atmore, 719 So. 2d 1190, 1194 (Ala. 1998). Thus, a plaintiff must allege "something in the nature of prying or intrusion" by a defendant. Stevenson, 762 So. 2d at 826 (Ala. 1999) (citation and quotation marks omitted). However, "acquisition of information from a plaintiff is not a requisite element of [this] cause of action." Phillips, 435 So. 2d at 709.

Defendants make no effort to distinguish between Lee and Conaway.  Instead, they argue generally that "there is no showing that the instructors invaded private matters warranting protection."  Def.'s Br. at 31.  This court disagrees, finding that Wilborn has made such a showing with respect to Lee.

The Alabama Supreme Court has explained that, "looking up one's skirt may constitute an invasion of privacy."  Ex parte Atmore, 719 So. 2d at 1194; see also Restatement 2d. of Torts § 652(B), cmt. c.[30] ("Even in a public place ... there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may ... be invasion of privacy when there is intrusion upon these matters.").  And that court has held that a plaintiff  presented substantial evidence

_____

    30.  Phillips, 435 So.2d at 708-09.  ("Restatement (Second) of Torts, § 652(B), and its Comment, enunciate a clear and concise definition, and establish the perimeter, of the 'wrongful intrusion' tort, which, when read in light of our own case law, affords meaningful guidelines for the adjudication of such actions.").

of an invasion of privacy by alleging that a defendant "made several lewd comments[,] asked [her] to meet him outside of work hours for other than business purposes[,] ... [and] looked up her skirt on more than one occasion." Ex parte Atmore, 719 So. 2d at 1194.

Wilborn has testified that Lee pulled her shirt up from behind in such a manner that she had to cross her arms to prevent her chest and bra from being exposed. Despite Wilborn's protests, Lee continued to hold up her shirt; invited Conaway to view her exposed back; and commented, "let me show you this spider bite on Selenia; it must be a man spider because it didn't bite nobody but her." Pl.'s Ex. A at 141:7-10. On that same occasion, Lee pulled out the elastic of her pants, exposing her underwear.

To be sure, Conaway made inappropriate comments about a pair of plastic handcuffs that were hanging in Wilborn's car. He also facilitated the showing of a pornographic film in the classroom and, in reference to depictions of a woman having sex with a horse, stated, "I bet you never had

98

one that big, Selenia." Pl.'s Ex. A at 180:1-2.  While
Conaway's behavior surely contributed to the creation of a
hostile environment--in ways at least as serious as Lee--
none of it was in the "nature of prying or intrusion."
Thus, summary judgment will be granted with respect to
Wilborn's invasion of privacy claim against Conaway.

### c.  Outrage

Wilborn brings claims of outrage against Lee and
Conway.  The Alabama tort of outrage "is essentially
equivalent to what many states refer to as 'intentional
infliction of emotion distress.'" K. M. v. Ala. Dep't of
Youth Servs., 360 F. Supp. 2d 1253, 1259 (M.D. Ala. 2005)
(Thompson, J.).  In order to prove a claim of outrage, a
plaintiff must establish that, "(1) the defendant ...
intended to inflict emotional distress, or should have
known that his or her acts would result in emotional
distress; (2) the act [was] extreme and outrageous; (3) the
act ... caused plaintiff['s] distress; and (4)
plaintiff['s] emotional distress [was] so severe that no

reasonable person could be expected to endure it." Id. at
1259 (citing Harrelson v. R.J., 882 So. 2d 317, 322 (Ala.
2003). The Alabama Supreme Court has emphasized "that this
tort does not recognize recovery for 'mere insults,
indignities, threats, annoyances, petty oppressions, or
other trivialities.'" American Rd. Serv. Co. v. Inmon,
394 So. 2d 361, 364-65 (Ala. 1980) (citation omitted).
Rather, recovery is only appropriate for "conduct so
outrageous in character and so extreme in degree as to go
beyond all possible bounds of decency, and to be regarded
as atrocious and utterly intolerable in a civilized
society." Id. at 365.

As indicated by the elements, "The tort of outrage is
an extremely limited cause of action." Potts v. Hays, 771
So. 2d 462, 465 (Ala. 2000). Nonetheless, the Alabama
Supreme Court has recognized the claim for conduct that
amounts to "egregious sexual harassment." Id. (citations
omitted).

Wilborn bases her outrage claim on all her alleged mistreatment in the Truck Program, not just the sexual harassment sex.  In other words, her outrage claim is based on Title VII sex harassment--which is, by definition, severe sexual harassment--plus additional inappropriate conduct.  A reasonable jury could conclude that the totality of the alleged conduct was sufficiently "extreme and outrageous" to support an outrage claim.

Wilborn has also alleged severe emotional distress proximately caused by the conduct, and the defendants reasonably should have known that emotional distress would result from their actions.  For these reasons, the court will allow her outrage claim to proceed to trial.

### d.  Negligent and/or Wanton Supervision, Training and Retention

Count VII of Wilborn's amended complaint asserts claims of negligent and/or wanton supervision, training and retention against Southern Union, ADECA and ADPE.  As noted above, these state agencies are protected by state

sovereign immunity, and thus are not subject to suit. Moreover, Wilborn explicitly conceded this claim in her response to the motion for summary judgment. <u>See</u> Pl.'s Br. at 62 n.23 ("Plaintiff also concedes ... Count VII of the Amended Complaint ... in its entirety.")

\*\*\*

For the forgoing reasons, it is ORDERED as follows:

(1) Defendants Southern Union State Community College, Alabama Department of Economic and Community Affairs (ADECA), Alabama Department of Postsecondary Education (ADPE), John Lee, and Doug Conaway's motion for summary judgment (doc. no. 29) is denied with respect to plaintiff Selenia Wilborn's:

> (a) Title VII sexual harassment claim against defendants Southern Union and ADECA, including her claim of hostile-environment constructive discharge;

> (b) Title IX sexual harassment claim for damages against defendant Southern Union;

(c) Fourteenth Amendment sexual harassment claim, through 42 U.S.C. § 1983, against defendants Lee and Conaway;

(d) Alabama state-law claims for assault, invasion of privacy, and outrage against defendant Lee; and,

(e) Alabama state-law claim for outrage against defendant Conaway.

Only these claims will go to trial.

(2) Said motion is granted in all other respects, with judgment entered in favor of defendants Southern Union, ADECA, ADPE, Lee, and Conaway and against plaintiff Wilborn in these respects, with plaintiff Wilborn taking nothing by her complaint in these respects.

DONE, this the 30th day of March, 2010.

    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE